## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE FOOD SERVICE EQUIPMENT HARDWARE ANTITRUST LITIGATION | Master Consolidated Case File No. 1:10-cv-1849-WSD |
| | **CLASS ACTION COMPLAINT** |
| **THIS DOCUMENT RELATES TO:** ALL CASES | **JURY TRIAL DEMANDED** |

QualServ Corporation and Kohlder Manufacturing, Inc. ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action for treble damages, injunctive relief and costs of suit under Section 1 of the Sherman Act and Section 4 of the Clayton Act against Kason Industries Inc., Peter A. Katz, Component Hardware Group, Inc., Thomas Carr and certain Unnamed Co-Conspirators (collectively "Defendants"), and allege, on information and belief, but on personal knowledge as to allegations relating to Plaintiffs, as follows:

### NATURE OF CLAIM

1.       This case arises from an unlawful conspiracy among producers of food service equipment component hardware to fix prices, rig bids, and allocate customers for food service equipment component hardware sold in the United States from February 2004 until February 2009 (though the effects of the

conspiracy may be felt after the conspiracy's end), in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

2.     As a result of this illegal conspiracy, Defendants Kason Industries Inc. ("Kason") and Component Hardware Group ("CHG") charged supra-competitive prices for food service equipment component hardware sold in the United States, thereby injuring Plaintiffs and members of the proposed Class (defined below).

3.     In February 2009, Defendant CHG sought amnesty from the United States Department of Justice ("DOJ") for its Sherman Act violations, prompting the DOJ to begin its investigation into Kason Industries Inc. and others.

4.     On May 6, 2010, Defendants Kason and Peter A. Katz, its former president, agreed to plead guilty to a one-count felony charge filed by the DOJ in the United States District Court for the Northern District of Georgia.  The information charged a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for conspiracy to allocate customers of food service equipment component hardware between December 2004 and at least December 2008.

## JURISDICTION AND VENUE

5.     This action arises under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 1, 15 and 26.

6.     This Court has jurisdiction under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and 28 U.S.C. §§ 1331 and 1337.

7.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b) and (c). Defendants reside, transact business, are found, or have agents in this District. Further, a substantial part of the events or occurrences giving rise to the claims alleged occurred in the District.

## PARTIES

8.     Plaintiff QualServ Corporation ("Qualserv") is a Delaware corporation with its principal place of business in Fort Smith, Arkansas. QualServ Corporation is a subsidiary and affiliate of QualServ Holding Company, f/k/a Food Service Holdings, Inc. During the Class Period (defined below), QualServ Corporation purchased food service equipment component hardware directly from Defendants Kason and CHG, and was damaged as a result of Defendants' unlawful conduct. The prices Qualserv paid for the food service equipment component hardware were, as a result of the conspiracy herein alleged, higher than they otherwise would have been, and as a result of the alleged conspiracy, Qualserv was injured in its business and property by reason of the antitrust violations alleged herein.

9.     Plaintiff Kohlder Manufacturing, Inc. ("Kohlder") is a New Jersey corporation with its principal place of business in Camden, New Jersey. Kohlder purchased food service component hardware directly from Defendants Kason and

CHG during the Class Period.  The prices Kohlder paid for the food service equipment component hardware were, as a result of the conspiracy herein alleged, higher than they otherwise would have been, and as a result of the alleged conspiracy, Kohlder was injured in its business and property by reason of the antitrust violations alleged herein.

10.     Defendant Kason Industries Inc. ("Kason") is a New York corporation with its principal place of business in Newnan, Georgia.  Kason is the leading manufacturer of commercial refrigeration hardware, including hardware for walk-in refrigerators and freezer doors.  Kason has nearly 250,000 square feet of manufacturing plants and offices at three locations in Newnan; four additional North America branches located in Lewis Center, Ohio, North Kansas City, Missouri, Oxnard, California, and Shenandoah, Georgia, and distributors around the globe.  During the Class Period, Kason sold food service equipment component hardware in this District and throughout the United States.

11.     Defendant Peter A. Katz ("Katz") is the former President of Kason.  As President, Katz had overall responsibility for Defendant Kason's performance in the sale of food service component hardware, among other products.  He was employed at Kason from January 24, 1964 to May 29, 2009.  During the Class Period, Katz, through Kason, sold food service equipment component hardware in this District and throughout the United States.

12.     Defendant Component Hardware Group, Inc. ("CHG") is a Delaware corporation with its principal place of business in Lakewood, New Jersey. CHG is a leading global distributor of food service equipment component hardware, including specialty hardware and plumbing products serving the food service, institutional, commercial and healthcare markets. CHG distributes food service equipment component hardware throughout the United States. During the Class Period, CHG sold food service equipment component hardware in this District and throughout the United States.

13.     Defendant Thomas Carr ("Carr") is the former President and CEO of CHG. As President, Carr had overall responsibility for Defendant CHG's performance in the sale of food service equipment component hardware, among other products. He was employed as the CEO of CHG for over ten years, until he was terminated for performance reasons on February 9, 2009. During the Class Period, Carr, through CHG, sold food service equipment component hardware in this District and throughout the United States.

## UNNAMED CO-CONSPIRATORS

14.     The "Unnamed Co-Conspirators" are individual employees of Kason or CHG who were also involved in the conspiracy to allocate customers for Food Service Equipment Hardware.

## INTERSTATE TRADE AND COMMERCE

15.     During the Class Period, Defendants Kason and CHG sold and shipped food service equipment component hardware in a continuous and uninterrupted flow of interstate and foreign commerce to customers located in states and countries outside the state of origin of the shipments.  In addition, payments for such food service equipment component hardware traveled in interstate and foreign commerce.

16.     During the Class Period, the business activities of Defendants Kason and CHG in connection with the manufacture and sale of food service equipment component hardware were within the flow of, and substantially affected, interstate and foreign trade and commerce.

## FOOD SERVICE EQUIPMENT COMPONENT HARDWARE

17.     Food service equipment component hardware includes but is not limited to fabricated and other parts used in food service equipment, including hardware such as handles, hinges, brackets, latches, fasteners, hydraulic and spring-loaded door closers, metal racks, drawer sliders, drawers and drawer pans used in walk-in refrigeration and in stand-alone hot and cold food service storage equipment; casters, legs, tubing, mounting plates and footings for work tables, food storage and other cafeteria and food service equipment; equipment and accessories for food preparation equipment; sliding door systems, thermometers and other

accessories for walk-in refrigeration; and other fabrication supplies used in the production of food service equipment. Food service equipment component hardware excludes oven canopy hoods and plumbing products. The annual volume of sales for walk-in refrigeration component hardware alone is estimated at up to $60 million in the United States.

18.     Customers of food service equipment component hardware include original equipment manufacturers and fabricators, which purchase food service component hardware for use in the final products that they manufacture, and then distribute those final products to dealers and other customers for sale to commercial and institutional food service businesses. These products include commercial kitchen equipment, coolers, freezers, ice makers, ovens, and heated cabinets. Other customers for food service equipment component hardware include replacement parts distributors and service and maintenance companies, which repair and maintain food service equipment. Diagram A represents the distribution system for food service equipment component hardware:

### Diagram A



## THE CONSPIRACY

19.     This case involves a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for sale of food service equipment component hardware in the United States.

20.     Katz, then president of Kason, and Carr, then CEO of CHG, had a close relationship in which they frequently met or communicated with each other via telephone or email.  They maintained lists of "protected" customers and agreed not to compete for those customers by refraining from submitting bids or submitting intentionally high bids.  They checked in on each other whenever they heard through a customer or sales staff that the other had been approached by one

of their own allocated customers, looking for a better deal. They offered "guidance" to each other regarding the pricing that they should offer an allocated customer, in order to drive that customer back to their "competitor." In short, Defendants engaged in a closely coordinated conspiracy over a period of five years to sell food service equipment component hardware at collusive, artificially-inflated and noncompetitive prices, and succeeded in carrying out that conspiracy, to the detriment of Plaintiffs and the Class.

21.   In 2003-2004, competition between Kason and CHG was depressing prices and decreasing both companies' profit margins in the market for food service equipment component hardware.

22.   In February 2004, Katz and Carr met in a hotel in Atlanta to discuss the effect that this competition was having on their companies. Shortly thereafter, Carr and Katz again discussed the harm to prices resulting from their competition, and agreed to allocate customers in the food service equipment component hardware market. Defendants allocated the market for food service equipment hardware by creating lists of their preferred customers (the "ABCD List"), with lists A & B representing CHG's preferred customers, and lists C & D representing Kason's preferred customers. Carr and Katz unlawfully agreed that CHG and Kason would not submit competitive bids if requested by a customer on the other's allocated list.

23.     Pursuant to this agreement to conspire, Defendants Kason and CHG proceeded to quote intentionally high prices and submit non-competitive bids to certain customers, or refrained from providing bids.  Defendants Kason and CHG then sold food service equipment component hardware to customers in the United States at collusive, artificially-inflated and noncompetitive prices pursuant to the agreements reached.

24.     Generally, Defendants Kason and CHG allocated themselves different product areas, with Kason focusing on walk-in and reach-in freezers, and CHG taking customers for hardware other than freezers.

25.     In some cases, Defendants agreed not to compete on certain products instead of customers.  For example, for certain customers, Kason was allocated evaporator pans and metal plates, while CHG was allocated hinges.

26.     Katz and Carr continued to communicate about the agreement, and their decision to allocate customers, throughout the Class Period.  For example:

(a)     In a March 6, 2008 email, Carr informed Katz that though a Kason customer was "hounding" CHG's sales people for quotes because they were tired of "'Kason's take-it-or-leave-it' attitude price-wise and late deliveries," Carr would talk to his people and "get them to layoff [sic]." A copy of this email as Exhibit A will be appended to this Complaint upon issuance of an Order by this Court to file such Exhibit under seal.

(b)   In a March 14, 2008 email to Katz, Carr states:

…requests for quoting your parts are coming in fast and often and I cannot control the process myself.  The most common complaints we're hearing are not so much the price increases, but what some customers are calling 'arrogance' and a 'they're trying to stick it to us' attitude. Stock outs are also a very frequent complaint as you know.

That said, we will maintain the agreement and try our best to get back on track.  *Id.*

(c)   In a June 17, 2008 email to Katz, Carr states:

I heard that you are in here quoting…..please have your people back off.

Thanks.

A copy of this email as Exhibit B will be appended to this Complaint upon issuance of an Order by this Court to file such Exhibit under seal.

(d)   In a December 2008 email exchange, Carr informs Katz that a CHG customer had informed Carr that it had received a bid from Kason for a particular product, and then asks Katz what price Kason would bid, were it to quote.  Katz responds, "About $1.50 but you would give me guidance."  Carr's reply is, "I like the sound of 1.64" to which Katz replies, "We can make that sound if asked."  A copy of this email as Exhibit C will be appended to this Complaint upon issuance of an Order by this Court to file such Exhibit under seal.

27.   Even certain customers who may not have been on the ABCD list may have been impacted.  For example, American Hood Systems, Inc., an Ohio

manufacturer of Exhaust Hoods and related products, was primarily supplied with food service equipment hardware by CHG. American Hood sought competitive bids from Kason, but Kason refused to offer a lower offer, and offered very negative credit terms, forcing American Hood to stay with CHG. In a separate instance, American Hood ordered from Kason, but the shipment was repeatedly delayed, until eventually American Hood was forced to cancel the order and continue buying from CHG.

28.     As a result of these unlawful agreements, Defendants Kason and CHG accepted payments for sales of food service equipment component hardware at collusive, artificially-inflated and noncompetitive prices.

29.     On February 9, 2009, Carr was terminated from his position as CEO for performance reasons. The new interim CEO quickly learned of Carr's agreement with Katz, and CHG filed for amnesty with the DOJ on February 11, 2009. CHG received conditional amnesty from the DOJ.

30.     In or about April 2009, the United States Federal Bureau of Investigation raided Kason's offices and Katz's home.

31.     Even the existence of a DOJ investigation did not stop Defendant Kason from attempting to mislead its customers. After becoming aware of the investigation, Kason CEO Alexander S. Katz distributed a letter to several customers. In the letter, Kason admitted its involvement in the conspiracy,

attempted to shift all the blame to Peter Katz and Carr, and stated (without factual support), "we believe your company suffered little, if any, damages as a result of this arrangement."

32.     On May 6, 2010, the DOJ announced that Defendants Kason and Katz had agreed to plead guilty for participating in the conspiracy. Copies of the agreements to plead guilty are annexed to this complaint as Exhibits D and E.

33.     In the plea agreement with Kason, it was stated:

> During the relevant period, the defendant, through its then chief executive officer, participated in a conspiracy with a competitor engaged in the manufacture and sale of commercial and institutional food service equipment component hardware, the primary purpose of which was to suppress and eliminate competition by allocating customers for the sale of commercial and institutional food service equipment component hardware, including walk-in refrigeration equipment, in the United States and elsewhere. In furtherance of the conspiracy, the defendant, through its then chief executive officer, engaged in discussions and attended meetings with representatives of another major commercial and institutional food service equipment component hardware manufacturer. During these discussions and meetings, agreements were reached to suppress and eliminate competition by allocating customers for the sale of commercial and institutional food service equipment component hardware, including walk-in refrigeration equipment, in the United States and elsewhere.
>
> ****
>
> This conspiracy was formed and carried out, in part, within the Northern District of Georgia, Atlanta Division. Some of the conspiratorial meetings and discussions

described above took place in Atlanta.  The commercial and institutional food service equipment component hardware that was the subject of this conspiracy was sold by one or more of the conspirators to customers in this District.

34.     As reflected in court documents filed in the Federal District Court for the Northern District of Georgia, Kason and Katz have admitted to entering into a combination and conspiracy to suppress and eliminate competition in the food service equipment component hardware market.  Kason and Katz carried out the unlawful price-fixing conspiracy by agreeing with one or more competitors to allocate customers for the sale of food service equipment component hardware. Defendants created and exchanged protected customer lists to implement and monitor the agreement.  As part of the agreement, Defendants actively rigged bids submitted to customers by either not submitting bids or prices to certain customers or by submitting intentionally high prices or bids to those customers.  Defendants also agreed with one or more competitors not to undercut one another's prices, and quoted prices to customers in accordance with agreed to-prices.

35.     On August 17, 2010, Kason pled guilty to participating in the conspiracy and was sentenced to five years of probation and a $3.3 million fine. *See* Exhibit F.  Katz is scheduled to be sentenced on January 5, 2011.

36.     Even the filing of the initial complaint in this matter did not stop Defendant Kason from continuing to engage in egregious behavior such as

retaliating against Plaintiffs in this case. Kason sales representatives have contacted both named Plaintiffs and informed them that, because they are part of the litigation process, all outstanding invoices would have to be paid before any more purchase orders would be accepted, and going forward all purchases would have to be paid for up front. Previously, both plaintiffs were on a thirty day billing cycle. Kason thus cut off Qualserv's credit terms in or about early July 2010, and Kohlder's on August 2, 2010.

**Effects of the Conspiracy**

37.    As a result of Defendants' unlawful conspiracy, prices for food service equipment component hardware have been fixed, raised, maintained, and/or stabilized in the United States during the Class Period.

**ANTITRUST INJURY TO PLAINTIFFS AND THE CLASS**

38.    In forming and effectuating their conspiracy, Defendants engaged in anticompetitive practices, the purpose and effect of which were to artificially raise, fix, stabilize and/or or maintain the price of food service equipment component hardware sold in the United States. These activities included:

(a)    Attending meetings or otherwise engaging in discussions and communications, face-to-face and by telephone, facsimile and electronic mail, regarding the sale of food service equipment component hardware in the United States;

(b)     Agreeing during those meetings, discussions and communications to allocate customers of food service equipment component hardware in the United States;

(c)     Agreeing during those meetings, discussions and communications not to compete for one another's protected customers or to submit intentionally high prices or bids to certain customers;

(d)     Agreeing during those meetings, discussions and communications to exchange prices to customers so as not to undercut one another's prices;

(e)     Agreeing during those meetings, discussions and communications to sell food service equipment component hardware at collusive, artificially-inflated and noncompetitive prices;

(f)     Allocating customers of food service equipment component hardware in the United States;

(g)     Refraining from competing with each other for the allocated customers;

(h)     Intentionally submitting high prices or bids to certain allocated customers, in order to maintain the allocation conspiracy;

(i)     Exchanging prices charged to customers regarding food service equipment component hardware with each other;

(j)     Selling food service equipment component hardware to customers at collusive, artificially-inflated and noncompetitive prices pursuant to the customer allocation agreement reached;

(k)     Accepting payment for food service equipment component hardware at collusive, artificially-inflated and non-competitive prices;

(l)     Authorizing, directing, or consenting to the participation of subordinate employees in the conspiracy; and

(m)     Concealing the conspiracy and conspiratorial contacts through various means.

39.     Defendants' unlawful conspiracy had and is having the following effects, among others:

(a)     Price competition in the sale of food service equipment component hardware has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for food service equipment component hardware sold by Defendants Kason and CHG has been fixed, raised, stabilized and/or maintained at artificially high, non-competitive levels in the United States; and

(c)     Customers who purchased food service equipment component hardware directly from Defendants Kason and CHG have been deprived of the benefits of free and open competition.

40.    By reason of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiffs and the Class have sustained injury to their business or property in amounts to be proven at trial.  The injury sustained by Plaintiffs and the Class is the payment of artificially-inflated prices to Defendants Kason and CHG for food service equipment component hardware during the Class Period.  This is an injury of the type that the antitrust laws were meant to punish, prevent, and redress.

## FRAUDULENT CONCEALMENT

41.    During the Class Period, Defendants affirmatively and fraudulently concealed their participation in the conspiracy alleged by holding themselves out as competitors to the public, to Plaintiffs, and to the Class.  Because of such fraudulent concealment, and the fact that a price-fixing conspiracy is inherently self-concealing, Plaintiffs and the Class could not have discovered the existence of this conspiracy until the DOJ's filing of criminal charges against Defendants Kason and Katz and their admission of antitrust violations in the agreements to plea guilty.

42.    Defendants wrongfully concealed their conspiracy by various means and methods that precluded detection, including but not limited to, secret meetings, misrepresentations to their customers concerning the reasons that they refrained from accepting or bidding for certain customers, and concerning prices charged for

food service equipment component hardware and surreptitious communications among Defendants by the use of the telephone, in-person meetings or trade association gatherings (and elsewhere) in order to prevent the existence of written records, limit any explicit reference to competitor pricing communications on documents, and to conceal the existence and nature of their competitor pricing discussions from non-conspirators.

43.    Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

44.    Defendants' purported reasons for refraining from accepting or bidding for certain customers, and for their charging artificially-inflated prices for food service equipment component hardware, were materially false and misleading and were made for the purpose of concealing Defendants' anticompetitive scheme as alleged in this Complaint.

45.    Plaintiffs and members of the Class reasonably relied on the materially false or misleading explanations by Defendants for refraining from accepting or bidding for certain customers, and for their charging artificially-inflated prices for food service equipment component hardware.  Plaintiffs and members of the Class were lulled into believing that Defendants' actions were the

result of normal competitive market forces, rather than the product of collusive activity by Defendants.

46.     These explanations were designed to, and did, put Plaintiffs and Class members off guard and caused them to accept Defendants' actions without undertaking further inquiry, as would any reasonable person under the circumstances.  Even had such inquiry been undertaken, it would have proven futile because Plaintiffs and members of the Class did not have access to contemporaneous information that would have allowed them to evaluate whether Defendants' claimed justifications for refraining from accepting or bidding for certain customers, and for their charging artificially-inflated prices for food service equipment component hardware were valid.

47.     At the time, Plaintiffs and members of the Class considered Defendants' articulated reasons for refusing to accept or bid for certain customers, and for their charging artificially inflated prices for food service equipment hardware during the Class Period to be both normal and legitimate.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legality of Defendants' refusals to accept or bid for certain customers, and their charges of artificially inflated prices for food service equipment hardware.

48.     Moreover, by its very nature, Defendants' conspiracy was inherently self-concealing, and indeed the success of the conspiracy depended on its self-concealing nature.  At all relevant times and in all relevant respects, Plaintiffs and other members of the Class exercised reasonable diligence.

49.     Because of the active steps Defendants took, including fraudulent concealment of their conspiracy, to prevent Plaintiffs and members of the Class from suing them for the anticompetitive activities alleged in this complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

50.     The running of any applicable statute of limitations has been equitably tolled as to any claims of Plaintiffs and members of the Class as a result of the anticompetitive conduct alleged in this complaint.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the Class.

52.     The Class is defined as:

> All persons or entities who purchased food service equipment component hardware directly from one or more of the Defendants in the United States at any time from February 1, 2004 through such time as the anticompetitive effects of the conspiracy ceased (the

> "Class Period").  Excluded from the Class are Defendants
> and their subsidiaries, parents, or affiliates, Defendants'
> co-conspirators, whether or not named as a Defendant in
> this Complaint.

53.    The Class is so numerous that joinder of all members is impracticable.

Due to the nature of the trade or the commerce involved, Plaintiffs believe that the

members of the Class are geographically dispersed throughout the United States,

and that joinder of all members of the Class would be impracticable.  While the

exact number of members of the Class is unknown to Plaintiffs at this time,

Plaintiffs believe that there are at least hundreds of members of the Class, and that

their identities can be learned from Defendants' books and records.

54.    Plaintiffs' claims are typical of the claims of the other members of the

Class.  The Plaintiffs and members of the Class purchased food service equipment

component hardware during the Class Period at artificially maintained, non-

competitive prices, established by the unlawful actions of Defendants.  The

Plaintiffs and members of the Class have sustained damage in that they paid

artificially-inflated prices for food service equipment component hardware during

the Class Period due to Defendants' conduct in violation of federal law as set forth

below.

55.    Plaintiffs will fairly and adequately protect the interests of the

members of the Class and have retained counsel competent and experienced in

class action and antitrust litigation.

56.     Common questions of law and fact exist as to all members of the

Class, which predominate over any questions affecting solely individual members

of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendants conspired to raise, fix, maintain or

stabilize the price of food service equipment component hardware in the United

States, which members of the Class purchased;

(b)     the date the conspiracy began;

(c)     whether Defendants' conduct violated the relevant federal

antitrust laws and caused injury to the business and property of Plaintiffs and the

members of the Class and, if so, the proper measure of damages;

(d)     whether Plaintiffs and members of the class are entitled to

declaratory or injunctive relief; and

(e)     whether Defendants undertook actions to conceal their unlawful

conspiracy.

57.     A class action is superior to other available methods for the fair and

efficient adjudication of this controversy because joinder of all Class members is

impracticable.  The prosecution of separate actions by individual members of the

Class would impose heavy burdens upon the courts and Defendants, and would

create a risk of inconsistent or varying adjudications of the questions of law and

fact common to the Class.  A class action, on the other hand, will achieve

substantial economies of time, effort and expense, and will assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

58.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical, rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for members of the Class, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## COUNT ONE

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND SECTION 4 OF THE CLAYTON ACT

59.     Plaintiffs incorporate by reference the preceding allegations.

60.     Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.  The matters complained of are a *per se* antitrust violation.

61.     The conspiracy consisted of a continuing agreement, understanding or concert of action between and among Defendants unreasonably to restrain trade and commerce.  In furtherance of the conspiracy, Defendants fixed, raised, maintained, and stabilized prices, rigged bids, and allocated customers for the sale

of food service equipment component hardware in the United States. Defendants'
conspiracy is a *per se* violation of the federal antitrust laws.

62.    Defendants' conspiracy, and resulting impact on the market for food
service equipment component hardware, occurred in or affected interstate and
foreign commerce of the United States.

63.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and
members of the Class have suffered injuries in that they have paid artificially-
inflated prices for food service equipment component hardware that they
purchased directly from Defendants during the Class Period.

## RELIEF SOUGHT

Accordingly, Plaintiffs demand judgment as follows:

A.    That the unlawful conspiracy alleged in this Complaint be adjudged
and decreed to be an unreasonable restraint of trade or commerce, in violation of
Section 1 of the Sherman Act and Section 4 of the Clayton Act;

B.    That the Court determine that this action may be maintained as a class
action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs
be appointed as class representatives, and that Plaintiffs' counsel be appointed as
counsel for the Class;

C.    That Plaintiffs and the Class recover the damages determined to have
been sustained by them, trebled as provided by law, and that judgment be entered

against Defendants, jointly and severally, on behalf of Plaintiffs and each and every member of the Class;

D.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in this Complaint;

E.     Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

F.     That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

G.     That the Court direct such other and further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs

demand a jury trial as to all issues triable by a jury.

Dated: September 17, 2010        Respectfully submitted,

/s/ W. Pitts Carr
W. Pitts Carr
North Parkway Square
4200 Northside Parkway
Atlanta, Georgia  30327
Tel (404) 442-9000
Fax (404) 442-9700
E-mail: pcarr@carrpalmer.com

***Plaintiffs' Interim Liaison Counsel***

Hollis Salzman
Ryan G. Kriger
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
E-mail: hsalzman@labaton.com
E-mail: rkriger@labaton.com

Michael Hausfeld
Megan Jones
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Fax: (202) 540-7201
E-mail: mhausfeld@hausfeldllp.com
E-mail: mjones@hausfeldllp.com

*Plaintiffs' Interim Co-Lead Class Counsel*

Daniel E. Gustafson
Jason S. Kilene
**GUSTAFSON GLUEK PLLC**
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Telephone: 612.333.8844
Facsimile: 612.339.6622
dgustafson@gustafsongluek.com
jkilene@gustafsongluek.com

Arthur M. Kaufman
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, OH 44114-2316
Telephone: 216.621.0150
Facsimile: 216.241.2824
amkaufman@hahnlaw.com

W. Joseph Bruckner
**LOCKRIDGE GRINDAL
NAUEN P.L.L.P.**
100 Washington Avenue S
Suite 2200
Minneapolis MN 55401
Telephone: 612.339.6900
Facsimile: 612.339.0981
wjbruckner@locklaw.com

Marvin A. Miller
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: 312.332.3400
Facsimile: 312.676.2676
mmiller@millerlawllc.com

Simon Bahne Paris
**SALTZ, MONGELUZZI,**
**BARRETT & BENDESKY, P.C.**
One Liberty Place, 51st Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 575-3986
Facsimile: (215) 575-3894
sparis@smbb.com

Joseph C. Kohn
**KOHN SWIFT & GRAF, P.C.**
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: 215.238.1700
Facsimile: 215.238.1968
jkohn@kohnswift.com

Marc H. Edelson
**EDELSON & ASSOCIATES, LLC**
45 West Court Street
Doylestown, P A 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735
medelson@edelson-law.com

Michael J. Boni
Joanne Zack
Joshua D. Snyder
**BONI & ZACK LLP**
15 St. Asaphs Road
Bala Cynwyd, P A 19004
Telephone: (610) 822-0200
Facsimile: (610) 822-0206
mboni@bonizackcom
jzack@bonizackcom
jsnyder@bonizackcom

Gregory P. Hansel
Randall B. Weill
**PRETI, FLAHERTY, BELIVEAU**
**& PACHIOS, LLP**
One City Center
P .O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
Facsimile: (207) 791-3111
ghansel@preti.com
rweill@preti.com

Michael Coran
Glenn Weiner
**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone: (215) 569-2700
Facsimile: (215) 568-6603
mcoran@klehr.com
gweiner@klehr.com

Steven A. Asher
Mindee J. Reuben
**WEINSTEIN KITCHENOFF**
**& ASHER LLC**
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone: (215) 545-7200
Facsimile: (215) 545-6535
asher@wka-law.com
reuben@wka-law.com

Mary Jane Fait
Adam J. Levitt
John E. Tangren
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, IL 60603
Telephone: (312) 984-0000
Facsimile: (312) 984-0001
fait@whafh.com
levitt@whafh.com
tangren@whafh.com

Roberta D. Liebenberg
Donald L. Perelman
Ria C. Momblanco
**FINE, KAPLAN AND BLACK**
1835 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 567-6565
Facsimile: (215) 568-5872
rliebenberg@finekaplan.com
dperelman@finekaplan.com
rmomblanco@finekaplan.com

Manuel J. Dominguez
Daniel A. Bushell
**BERMAN DEVALERIO**
4280 Professional Center Drive
Suite 350
Palm Beach Gardens, FL 33410
Telephone: (561) 835-9400
Facsimile: (561) 835-0322
mdominguez@bermandevalerio.com
dbushell@bermandevalerio.com

Thomas A. Muzilla
**THE MUZILLA LAW FIRM, LLC**
Tower at Erieview, Suite 1100
1301 East 9th Street
Cleveland, OH 44114
Telephone: (216) 458-5880
Facsimile: (216) 928-0016
tom@muzillalaw.com

Howard Sedran
**LEVIN, FISHBEIN, SEDRAN**
**& BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
hsedran@lfsblaw.com

Jeffrey B. Gittleman
**BARRACK, RODOS & BACINE**
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA 19103
Telephone : (215) 963-0600
Facsimile : (215) 963-0838
jgittleman@barrack.com

Benjamin D. Brown
Emmy L. Levens
**COHEN, MILSTEIN, SELLERS
& TOLL PLLC**
1100 New York Avenue, N.W.
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
bbrown@cohenmilstein.com
elevens@cohenmilstein.com

Eugene A. Spector
Bill G. Caldes
Jeff L. Spector
**SPECTOR, ROSEMAN
& KODROFF**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (610) 283-3379
espector@srkw-law.com
bcaldes@srkw-law.com
jspector@srkw-law.com

Warren Rubin
**LAW OFFICES BERNARD M.
GROSS, P.C.**
100 Penn Square East, Suite 450
Philadelphia, PA 19107
Telephone: (215) 561-3600
Facsimile: (215) 561-3000
warren@bernardmgross.com

Zack M. Azar
**AZAR & AZAR LLC**
4276 Lomac Street
Montgomery, Alabama 36106
Telephone: (334) 265-8551
Facsimile: (334) 264-9453
zazar@azarlaw.com

M. Stephen Dampier
**LAW OFFICES OF M. STEPHEN
DAMPIER, P.C.**
55 N. Section Street
P.O. Box 161
Fairhope, Alabama 36533
Telephone: (251) 929-0900
Facsimile: (251) 929-0800
stevedampier@dampierlaw.com

Brian P. Murray
Lee Albert
**MURRAY, FRANK &
SAILER LLP**
275 Madison Avenue
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892
bmurray@murrayfrank.com
lalbert@murrayfrank.com

Everette L. Doffermyre
Kenneth S. Canfield
**DOFFERMYRE SHIELDS CANFIELD
& KNOWLES, LLP**
1355 Peachtree Street, Suite 1600
Atlanta, GA 30309
Telephone: (404) 881-8900
Facsimile: (404) 881-3007
Edoffermyre@dsckd.com
kcanfield@dsckd.com

*Additional Plaintiffs' Counsel*