```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
                        ATLANTA DIVISION

QUALSERV CORPORATION, et al.     )
                                 )
             Plaintiffs,         )   CIVIL ACTION FILE
                                 )   NO. 1:10-CV-1849-WSD
v.                               )
                                 )   ATLANTA, GEORGIA
KASON INDUSTRIES, INC., et al.   )
                                 )
             Defendants.         )
_____)


                TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
              UNITED STATES DISTRICT JUDGE

                   Friday, October 28, 2011


APPEARANCES OF COUNSEL:

For the Plaintiffs:         CARR & PALMER
                            (By:  W. Pitts Carr)

                            HAUSFELD LLP
                            (By:  Hilary K. Scherrer)

For Defendants Kason and    SUTHERLAND ASBILL & BRENNAN
Katz:                       (By:  James R. McGibbon
                                  Joshua A. Mayes)

For Defendant CHG:          BONDURANT MIXSON & ELMORE
                            (By:  Frank M. Lowrey, IV)


       Proceedings recorded by mechanical stenography
         and computer-aided transcript produced by
              NICHOLAS A. MARRONE, RMR, CRR
                  1714 U. S. Courthouse
                   75 Spring Street, S.W.
                    Atlanta, GA  30303
                      (404) 215-1486
```

```
1                    Friday Morning Session

2                      October 28, 2011

3                         11:10 a.m.

4                         -- -- --

5                    P R O C E E D I N G S

6                         -- -- --

7              (In open court:)

8              (Ms. Scherrer attending by teleconference.)

9              THE COURT:  Good morning, everybody.

10             This is the hearing on plaintiffs' combined

11   motion for final approval of proposed settlement with

12   Kason Industries, Inc., Peter A. Katz and Component Hardware

13   Group, Inc.

14             And there's also, and we'll take that up second,

15   plaintiffs' motion for award of attorneys' fees and

16   reimbursement of expenses.

17             But let's first consider the combined motion, all

18   of which I have reviewed including the attachments.

19             I will note for the record it doesn't look like

20   there is anybody here other than the lawyers, so I assume

21   that nobody from the public or that's a member of the class

22   would like to say anything.

23             So with that note, I will turn it over to you,

24   Mr. Carr.

25             MR. CARR:  Thank you, Judge.
```

```
1                THE COURT:  You are welcome.
2                MR. CARR:  Judge, we have Hilary Scherrer from the
3    Hausfeld firm that is participating by telephone with us this
4    morning.
5                For the record, I'm Pitts Carr of Carr & Palmer for
6    the plaintiffs.
7                THE COURT:  Let me make sure, Ms. Scherrer, are you
8    with us?
9                MS. SCHERRER (By teleconference):  Yes, I am.  Good
10   afternoon, Your Honor.
11               I'm sorry I couldn't be there in person.  I came
12   down with the flu this week, and I figured you all would
13   appreciate me not bringing that down to Atlanta.
14               THE COURT:  Well, your flu must be affecting your
15   sense of time because it's still morning here.
16               MS. SCHERRER:  Oh, yes.
17               THE COURT:  All right.  Thank you.
18               All right.  Go ahead, Mr. Carr.
19               MR. CARR:  Judge, I will be brief on this, as brief
20   as Your Honor wants me to be.
21               After your preliminary approval and notice
22   authorization in June, we sent out the notice that was
23   approved with the various claim forms.  It described the
24   settlement, as you may recall, as $800,000 in cash on CHG, a
25   2.75 percent rebate on CHG; a million cash, and 2.75 rebate
```

from Kason.

The rebates run from a month after final approval, 24 months for CHG and 30 months for Kason. And importantly you can redeem your rebate or claim your rebate all the way up until the end of the 24- or 30-month period, the only difference being that obviously the later you wait, the less value you are going to get out of it.

We had estimated the value of the rebates to be for CHG about a million seven and for Kason about 3.4 million, with an estimated total value of the settlement of $6,945,000.

As a result of that, of your preliminary approval order, notice went out originally to forty-seven hundred members. There was some problems with the mail. Some of them were returned, and they were researched and then remailed out. That list got culled down to about forty-four hundred.

As a result, no objections have been made. There are only two opt-outs. The participation rate has been pretty substantial, with 42 percent of Kason's customers by volume of sales participating, and CHG claimants accounting for 49 percent of the estimated 139 million of volume of commerce as calculated by the Justice Department.

Further, we provided the notice requirements under CAFA to both the federal and state agencies, and no agency

1   has raised any objection to the settlement.

2          We turn now to what we call the *Bennett* factors,
3   which I will just touch on briefly to make a record on
4   it.  *Bennett*, of course, in the Eleventh Circuit is the bell
5   cow for class settlement approvals in this circuit.

6          In that case, the court starts off by pointing out
7   that settlement of a complex case is in the public interest
8   and preferable to protracted litigation as a general matter;
9   that it should be approved if fair, reasonable and adequate,
10  and not based on collusion; it is not a mini-trial on the
11  merits; it should be shown to be an arm's length
12  transaction.

13         Then the court is instructed -- the trial court is
14  instructed to take into account the uncertainties of
15  litigation.

16         Here, well, as a general proposition, antitrust
17  cases are deemed to be among the more complex cases that the
18  courts deal with.  In it, the more complex, obviously the
19  greater uncertainties you had.

20         We felt that we had a very strong case.  We have
21  indictments and pleas.  On the other hand, there are very
22  stringent claims of defenses on damages as to whether or not
23  the conspiracy really took hold, and those issues can be
24  extremely difficult.

25         Cost is the next consideration.  It would be very

1  expensive to take this matter through trial with the
2  requirement for damages experts and other experts which can
3  run up into the many hundreds of thousands of dollars.
4          Delay is another consideration.  Obviously there
5  would be substantial delay.
6          There are issues as to class certification that
7  have been raised by the defendants which might get legs at
8  some point, particularly relating to Kason and where some of
9  them had settled and some of them had not settled.
10          There are ultimately issues possibly of
11  collectability.  If you did have a clean sweep and won
12  everything and held everything on appeal, the companies
13  provided data to us suggesting that they were having some
14  economic stress and strain like a lot of others were, and we
15  were by no means assured that if you got a big verdict, that
16  you would be able to collect it at the end of the day.
17          Next we talk about complexity, expense and
18  duration.  Really, I think that's subsumed in what I have
19  already said.
20          Acceptance is an important consideration.  And
21  I think, as I have already explained to the Court the
22  acceptance, where we have over four thousand notices going
23  out, we have no objections, and only two opt-outs.
24          Then we look to the stage of the proceedings.  We
25  were assisted here early on by a cooperation agreement with

1  CHG which provided enormous amounts of information to us as
2  to how the alleged conspiracy developed and operated and the
3  entities involved in it.  We also had the benefit of
4  indictments and plea agreements.
5          And lastly under *Bennett* is the opinion of counsel
6  is to be given great weight here.  We have counsel that
7  irrefutably have decades collectively of experience dealing
8  with antitrust issues.
9          All of the technical materials relating to the
10 number of people participating and so on is set out in the
11 Rust affidavit.  We had 288 claim forms for the cash fund,
12 370 for the rebate registration, which is 658 total
13 participating in the claims process.  If you look just at
14 that, that would be approximately a 15 percent participation
15 rate of the notices that were ultimately mailed out.
16         If you look at -- if you dedupe that list, because
17 some applied for cash and rebates, if you deduped that list,
18 then the participation rate is reduced to about 10 percent,
19 still a respectable return rate for a class of this nature.
20         In addition, as pointed out in the Rust affidavit,
21 they established a toll-free hotline for purposes of ease of
22 communication with the class members.  They had a website
23 that had instructions and had all of the documents on it that
24 anyone would need to participate.
25         On the rebate matter, we have 144 million in sales

1  reflected on the cash fund aspect of it.  In other words,
2  when they applied to the cash fund, they had to provide their
3  sales during the four-year class period.  They did not have
4  to do that if they were applying just for a rebate.
5           If you go through the math on that and do the
6  estimates, you can come up with an estimate of the amount of
7  sales participating in the two, both the cash and the rebate
8  form, all participate on the rebate form as sales as a
9  function of two years as opposed to four years, then you
10 could estimate that the rebate portion of it is going to be
11 in the range of $4,435,000.  And that's just on a 24-month
12 period -- it would increase due to the 30-month on Kason --
13 and that does not take into account the fact that they can
14 exercise the rebate.  Those that have not already claimed the
15 rebate have until the end of the rebate period to make that
16 claim.
17          Obviously at the end of the day, the value of the
18 rebate is going to depend on who actually uses it and their
19 purchases.  Hopefully the economy is going to continue to
20 trend up and it would be of more value, but we won't really
21 know the full range of value of that until the rebate
22 period --
23          THE COURT:  Continue to trend up?
24          MR. CARR:  I'm sorry?
25          THE COURT:  Continue to trend up, as if there was a

1  trend --

2  MR. CARR: Well, I just heard coming in that the
3  consensus is that it's trending up but at a slow rate.
4  I didn't mean to suggest that the problems were behind us,
5  but there is data out there apparently suggesting that we are
6  in a very slow recovery.

7  Your Honor, I was going to turn to the fee memo at
8  this point, unless you had any questions about the settlement
9  before I get to fees?

10 THE COURT: No. And let's -- let me hear from --
11 see if there is any input from the defendants on the
12 settlement itself?

13 MS. SCHERRER: Your Honor, it's Ms. Scherrer. If
14 I may just note for the record, as Mr. Carr said, we do have
15 two opt-outs. Neither one of them has expressed any
16 displeasure with the settlement.

17 And the first opt-out, Global Equipment & Supplies,
18 have less than a hundred dollars in purchases during the
19 class period, and the second, Holley Services, Inc., had only
20 $3,708 in purchases during the class period. So these are
21 very minor opt-outs.

22 THE COURT: Right. I mean, just the nature of
23 their opt-outs looked to me like -- as I recall, one of them
24 to me looked like they wrote it on a piece of scratch paper
25 and sent it in. So I got a sense that they might just be

1    people that were opting out as a matter of principle.
2              MS. SCHERRER:  Yes, Your Honor.
3              MR. McGIBBON:  Your Honor, I have nothing to add.
4              I can guarantee you it was not a settlement of
5    collusion.  It was a hard negotiated settlement.
6              And we do think we have defenses on damages and
7    class action that we would have to litigate at great length
8    if we were to move forward.
9              But unless you have questions, Your Honor, that's
10   all I really have to add.
11             MR. LOWREY:  Your Honor, from CHG's standpoint, the
12   only observation I would add -- and it may have already been
13   said -- was that there is not only no public objection here
14   today in the hearing, but no objections received whatsoever.
15             THE COURT:  Yes.
16             MR. LOWREY:  Other than that, I echo the remarks
17   made by counsel already.
18             THE COURT:  Let me just tell you what I've -- I
19   have always thought that this particular settlement in this
20   industry with these customers and these defendants, that this
21   made a lot of sense to me.
22             I thought you did a good job of explaining to me
23   how you calculated the -- what I guess is the anticipated
24   benefit to the class members, and I know that there were
25   financial considerations and concerns about the viability of

1   the companies.  And I believe because of who you are and just
2   the nature of this case that this was not colluded, that it
3   took a while to get where you are.
4            The fact of the way that you worked through this to
5   make sure that I was comfortable with what the settlement was
6   with respect to both Kason and also to Component Hardware,
7   that I thought the process was a good one, and I thought the
8   result was a reasonable one.
9            And so I don't have any reservations about
10  approving the settlement.
11           MR. CARR:  All right, sir.  Judge, with that, I
12  will turn to the fee issue.
13           As you noticed when you read the materials, our fee
14  is limited to a 25 percent participation in the cash fund
15  only.  We are not claiming a fee on the rebate component of
16  it.
17           As *Bennett* is the bell cow on what's required to be
18  proved, *Camden,* as the Court certainly knows, is the bell cow
19  on how we establish fees in this circuit.
20           Cut to the simplest, under *Camden*, the range is,
21  generally speaking, 20 to 30 percent with a benchmark of
22  25 percent, and you can move upward or downward with that
23  applying the old *Johnson* factors.
24           Since we are right at the benchmark, I don't know
25  that we need to spend a lot of time on the *Johnson* factors,

```
1   but they include --
2              THE COURT:  Although the benchmark is changing.
3              There have been two or three decisions, not out of
4   our circuit, but out of the northeast in the Second Circuit
5   that has persuaded me that we are looking more closely at fee
6   applications.  And as you know, I have always done that, so
7   I'm not a sort of tell me what the benchmark is, then I will
8   routinely apply that.
9              And there are two things in this case that, in
10  order for me to make sure that I am doing the right thing,
11  although the approach of limiting it to the cash amount as
12  opposed to trying to increase it by anticipating what the net
13  is, and in most cases I tell lawyers that I want the class to
14  vote on the benefit that they get, and so I actually wait
15  until all the class benefit is determined.  And that has
16  persuaded me in a couple of cases to significantly change my
17  view on what the attorneys' fees award ought to be.
18             But that's different than this case, because, you
19  know, there is the history of what people were purchasing,
20  there is the uncertainty of the economy, but your attorneys'
21  fees aren't geared to the 6.4 million that you expect.  So
22  I'm not as concerned about that.
23             The other factor that's different in this case,
24  I think this is only the second case I have had where there
25  was already a criminal prosecution.  And I would just say
```

1  that that just strikes me, as it did in the other case, which
2  was the Friedman's Jewelers case, which was a securities
3  class action, is I realized how much easier it was for the
4  plaintiffs' lawyer where there was a criminal prosecution, how
5  much time they saved just because the dynamics were totally
6  different than a regular civil class action without a
7  criminal component to it.
8         And I'm not saying that that necessarily played out
9  here, but what I most always do is ask for some information
10 about what time you actually had in the case --
11        MR. CARR:  Right.
12        THE COURT:  -- and by whom that time was recorded
13 to make sure that it wasn't -- or if it was leveraged up to
14 the higher billing in timekeepers, in some cases that's
15 appropriate because that's where the work needs to be done.
16        So I was going to ask that I get some detail
17 information about the actual recorded time and services by
18 timekeeper by the people that are going to participate -- by
19 the firms that are going to participate.
20        MR. CARR:  All right.
21        THE COURT:  And secondly, I do want some more
22 detail information about fees and expenses, just what are
23 those.  And I always look carefully at travel and whether or
24 not there was maybe not frugality or at least reasonable
25 limitations on expenses.

1    And I suspect that's probably -- I won't have a
2    concern in this case, but I always feel better and it's
3    precedential for me, that others might say he always does
4    that because I always do that, and I don't want somebody to
5    come back and say, well, why didn't you do it in that case.
6         MR. CARR:  Well, we can provide very detailed
7    information on both of those fronts.
8         I would mention on the expense item, of the one
9    hundred twenty-five thousand, the biggest part of that is
10   Rust, the claims administrator.
11        THE COURT:  Of course.
12        MR. CARR:  But we will give you a schedule both on
13   the Lodestar amounts --
14        THE COURT:  Right.
15        MR. CARR:  -- and a precise statement as to the
16   expenses.
17        I will say, as was set out in the Jones
18   declaration, the total Lodestar was around nine hundred
19   thousand, so we are well under even just the basic Lodestar
20   number anyway.
21        THE COURT:  How soon could you get that to me?
22        MR. CARR:  I would think certainly within a
23   week.  I mean, we have it.
24        THE COURT:  It's compiling it and getting it over
25   here --

1          MR. CARR:  It's just getting it, extracting it, and
2     double-checking to make sure it's right and so forth and
3     getting it to you in an appropriate form.  But certainly a
4     week at the maximum.
5          THE COURT:  Okay.
6          MR. CARR:  Just looking at the -- at a few of the
7     most important *Johnson* factors, results achieved, I don't
8     think that is an issue here.
9          Nonmonetary benefits, we do have a substantial
10    asset for the class.  You know, what use they make of it is
11    up to them, but it would appear that it is going to be a very
12    substantial use based on the rebate applications received to
13    date.
14         Next you look at objections.  As we have mentioned,
15    there are none.
16         The time required.  I tried to explain to
17    Mr. McGibbon a few times what you said about this is a
18    criminal case, we have indictments, and he didn't seem
19    particularly persuaded by that.  So it has been a
20    knock-down-drag-out disagreement from day one, which is as it
21    should be.
22         THE COURT:  Right.
23         MR. CARR:  But I didn't want you to have the
24    impression that everybody just rolled over because there were
25    indictments, because that was not the case.

1           Novelty of the issues.  You know, in and of itself,
2   antitrust cases are not particularly novel, but they
3   certainly are complex, and here we had a couple of complex --
4   we had complexity for sure in that one of the defendants had
5   one product list and the other had a variation of that, which
6   created some real challenges both in the settlement process,
7   how you write down the settlement process, how you do the
8   notice and describe that in a way that somebody could
9   hopefully actually understand what in the world it was you
10  were trying to say to them about that.
11          The next is experience of counsel.  I don't believe
12  that that's an issue.
13          Next, awards in similar cases.  We went to the
14  trouble to list quite a number of cases in our brief, and,
15  you know, even in this court there are several at the
16  30 percent level in class actions.  There are some lower, but
17  for the most part in this circuit so far as I can tell, still
18  that 20 to 30 percent with the middle of 25 percent is well
19  accepted as the way to go.
20          Lastly, Judge, we have asked for a ten thousand
21  dollar stipend for each of the two plaintiffs.  We have
22  documented that those are well accepted within this
23  circuit.  It's a very modest amount.
24          We did have some -- the allegations of retaliation
25  as to at least one of our class representatives, as you may

```
 1   recall, and we had put in the notice that we were going to
 2   apply for up to 30 percent.  We are well under that, and way,
 3   way under that even if the Court were to award the
 4   stipends.
 5           And lastly on that, neither of the defendants has
 6   any objection to the stipends.  So we would ask that that --
 7   that the ten thousand for the two named plaintiffs be
 8   approved.
 9           THE COURT:  Okay.
10           MR. CARR:  That's pretty much what I have to say,
11   Your Honor.  Unless you have any other questions?
12           THE COURT:  I don't.
13           Do the defendants want to weigh in on the attorney
14   fee application, other than what you have obviously weighed
15   in informally with Mr. Carr already?
16           MR. McGIBBON:  No, Your Honor.
17           MR. LOWREY:  Nothing here, Your Honor.
18           THE COURT:  All right.  Thanks.
19           Then, Mr. Carr, if you will get to me as soon as
20   you can this additional information, we will try to turn to
21   that.  I mean, I look at those personally, so I have got some
22   capacity to do that if you get it in before -- a couple weeks
23   before Thanksgiving, I can probably get something out.
24           MR. CARR:  Now, you had asked me to bring a clean
25   copy of the orders on the approval of the settlement.  Shall
```

```
 1   I hand that up to you?
 2              THE COURT:  Yes, please.
 3              MR. CARR:  How many do you want, Judge?
 4              THE COURT:  One of each is fine.  But it doesn't
 5   have holes in it, does it?
 6              Why don't you --
 7              MR. CARR:  You want one without holes?
 8              THE COURT:  Look, I already found your typo, so I'm
 9   at least entitled to --
10              MR. CARR:  I will send it --
11              THE COURT:  If you will just e-mail it to Jessica,
12   we can print it out here.
13              MR. CARR:  I will.  I didn't think about the
14   holes.
15              All right.  Judge, thank you very much.  We
16   appreciate the cooperation of Your Honor and your staff,
17   which has been very exemplary from our standpoint throughout
18   these rather protracted proceedings.
19              THE COURT:  They are incredibly gifted people in
20   what they do and they are incredibly service-oriented, and
21   I'm grateful to have them.
22              MR. CARR:  Hilary, did you want to say anything
23   else?
24              MS. SCHERRER:  No, I have nothing further.
25              MR. CARR:  All right, good.
```

```
 1              Thank you, Judge.
 2              THE COURT:  All right.  Thanks, everybody.
 3              Thanks, Ms. Scherrer, for being with us.  I hope
 4   you feel better.
 5              MS. SCHERRER:  Thank you.  I appreciate it.
 6              THE COURT:  And everybody have a good weekend.
 7              We will be in recess.
 8                  (Proceedings adjourn at 11:34 a.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# C E R T I F I C A T E

UNITED STATES OF AMERICA :
                        :
NORTHERN DISTRICT OF GEORGIA :

     I, Nicholas A. Marrone, RMR, CRR, Official Court Reporter of the United States District Court for the Northern District of Georgia, do hereby certify that the foregoing 20 pages constitute a true transcript of proceedings had before the said Court, held in the city of Atlanta, Georgia, in the matter therein stated.

     In testimony whereof, I hereunto set my hand on this, the 3rd day of July, 2013.

*/s/ Nicholas A. Marrone*
_____
NICHOLAS A. MARRONE, RMR, CRR
Registered Merit Reporter
Certified Realtime Reporter
Official Court Reporter
Northern District of Georgia